IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GLORIA S. PANIAGUA,<br><br>                    Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, in her capacity as Acting Commissioner of the Social Security Administration,<br><br>                    Defendant. | MEMORANDUM DECISION AND ORDER ON ADMINISTRATIVE APPEAL<br><br><br>Case No. 2:12-CV-1186 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Plaintiff Gloria S. Paniagua's appeal from the decision of the Social Security Administration denying her application for Social Security Disability Insurance Benefits ("SSDI") and Supplemental Security Income benefits ("SSI"). Having considered the arguments of the parties, reviewed the record and relevant case law, and being otherwise fully informed, the Court will reverse the administrative ruling.

## I.  STANDARD OF REVIEW

This Court's review of the administrative law judge's ("ALJ") decision is limited to determining whether his findings are supported by substantial evidence and whether the correct legal standards were applied.[1]  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2]  The ALJ is required to

---

[1] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

[2] *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

consider all of the evidence, although he is not required to discuss all of the evidence.[3] If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[4] The Court should evaluate the record as a whole, including that evidence before the ALJ that detracts from the weight of the ALJ's decision.[5] However, the Court should not re-weigh the evidence or substitute its judgment for that of the ALJ's.[6]

## II. BACKGROUND

A. PROCEDURAL HISTORY

On June 3, 2010, Plaintiff filed for SSDI and SSI, alleging a disability onset date of June 1, 2010. Plaintiff's claims were denied both initially and on reconsideration. Plaintiff attended a hearing before an ALJ on September 1, 2011. On September 20, 2011, the ALJ denied Plaintiff's claims. Plaintiff requested review by the Appeals Council, but was denied on October 19, 2012. This appeal followed.

B. MEDICAL HISTORY

Plaintiff claims disability as a result of several impairments, including lower back pain, depression, asthma, bronchitis, anemia, bipolar disorder, post-traumatic stress disorder, and suicidal ideation.[7] Plaintiff has a long history of self-harm, including numerous suicide attempts beginning in 1988, and has struggled with suicidal ideation since childhood.[8] She also reports a

---

[3] *Id.*

[4] *Richardson v. Perales*, 402 U.S. 389, 402 (1981).

[5] *Shepard v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[6] *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

[7] R. at 232.

[8] *Id.* at 71.

"lifelong struggle with anger and bad thoughts."[9]  The record contains medical records from 2010 through 2012.

*1. Treating Physicians*

On March 19, 2010, after being found difficult to rouse, Plaintiff was taken by ambulance to the emergency department at Salt Lake Regional Hospital.[10]  Plaintiff admitted to taking Zoloft in a suicide attempt.  The attending physician, Dr. Roberts, diagnosed nontoxic ingestion of Zoloft (intentional overdose), alcohol ingestion, and self-harm ideation.[11]

On May 6, 2010, Plaintiff was seen at the University of Utah emergency room for an overdose of Tylenol and possibly Geodon.[12]  The attending physician, Dr. Freeman, assessed Plaintiff for Tylenol overdose and polysubstance abuse.[13]  The following day, Dr. Lewis, another treating physician who saw Plaintiff during the same episode, diagnosed bipolar disorder not otherwise specified, posttraumatic stress disorder, alcohol abuse, cocaine abuse, and personality disorder cluster B traits.  As part of Plaintiff's treatment plan, she was admitted for further inpatient care by Dr. Singh.[14]  Dr. Lewis also noted that Plaintiff had experienced a sexual assault at the age of twenty-seven or twenty-eight and that it is "unclear to what extent her

---

[9] *Id.* at 740.

[10] *Id.* at 461.

[11] *Id.* at 462.

[12] *Id.* at 342.

[13] *Id.* at 344.

[14] *Id.* at 340.

activation is secondary to features of posttraumatic stress disorder."[15]  Even so, he notes that hypomania precedes her sexual trauma.[16]

On July 7, 2010, Plaintiff saw Joel Hunt, PA-C, in order to establish a relationship with a primary care health provider and seek medication for bipolar.[17]  At that time, Plaintiff indicated that she last used alcohol on July 3, 2010, and indicated that she had recently been in a fight with a neighbor.[18]

On July 23, 2010, Plaintiff was taken by ambulance to the University of Utah emergency department for having taken an overdose of Depakote and Trazodone with the intent to kill herself.[19]  On admission, Plaintiff reported that she had not consumed alcohol since her May 2010 hospitalization, but then stated that she had consumed alcohol on three occasions since her release from the hospital in May 2010.  She admitted that she had used cocaine, smoked spice, and had consumed alcohol the night before the overdose.[20]  Plaintiff's history and physical on admission, authored by Dr. Howsley and signed by the attending physician Dr. Singh, noted that Plaintiff attempted to end her life and that "[t]his [wa]s done in the context of increased alcohol use, recent eviction, the patient's daughter moving away and financial problems as well as the patient not taking her medications for her bipolar disorder."[21]  Dr. Nemethy, in her report on Plaintiff during this same incident, noted that Plaintiff had not taken

---

[15] *Id.*

[16] *Id.*

[17] *Id.* at 401.

[18] *Id.*

[19] *Id.* at 330.

[20] *Id.* at 331.

[21] *Id.* at 334.

her prescription medication for one to two weeks prior to the suicide attempt and that Plaintiff "[u]ses alcohol regularly."[22]  Plaintiff was discharged on July 26, 2010.[23]

On August 4, 2010, Plaintiff saw Mr. Hunt again.  He diagnosed chronic hepatitis C, hypothyroidism, and depression, and prescribed medication.[24]  He informed Plaintiff that she should stop drinking alcohol, "which she does regularly on the weekend."[25]  Plaintiff stated that "she does not have a problem [with alcohol] and she has been kind of looking for a reason to stop drinking for a while so she will be happy to stop drinking."[26]

On September 30, 2010, Plaintiff again saw Mr. Hunt and stated she was "generally doing well and handling the stress of leaving her boyfriend without using alcohol."[27]  He found Plaintiff to be in no acute distress, normal appearance and affect, euthymic mood, and no thought impairment.[28]  However, he noted that she had increased anxiety.[29]  On October 14, 2010, Mr. Hunt noted during a visit with Plaintiff that she was doing well on her psychiatric medications and "[i]f she accidentally misses a day from her Depakote she can feel the difference in her ability to control impulse and anger."[30]  Plaintiff saw Mr. Hunt again on November 22, 2010, at which time she indicated she has had "terrible thoughts" of hurting someone.[31]  She indicated

---

[22] *Id.* at 321.

[23] *Id.* at 347.

[24] *Id.* at 396.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 509.

[28] *Id.* at 509–13.

[29] *Id.*

[30] *Id.* at 502.

[31] *Id.* at 740.

that she left her medications at her boyfriend's house and then did not return to get them for five days.[32] She also indicated that she took several Trazodone and cut her left wrist several times because she likes to see the blood come out.[33]

The record also contains numerous individual psychotherapy notes from Valley Mental Health where Plaintiff met with Paul Rasmussen, LCSW, and Margo Stevens, APRN. These notes indicate that on July 27, 2010, after discharge from the hospital, Plaintiff saw Mr. Rasmussen to set recovery goals. Mr. Rasmussen noted that Plaintiff had severe bipolar disorder with psychotic features and that she "endorses episodes of mania characterized by decreased need for sleep, inflated self-esteem, increased goal-directed activity, elated mood, increased energy, hypersexuality and irresponsible spending."[34] Additionally, on August 23, 2010, Plaintiff saw Mr. Rasmussen, complaining that her medications made her feel numb to the point that she could not feel or think.[35] At this meeting, she disclosed that her son-in-law was found dead of an overdose.[36] Plaintiff also indicated she was "clean and sober for the past three weeks."[37] Mr. Rasmussen noted that, "[t]his is apparently very new for her. She reports being drunk most of the time prior to this, which is not consistent with her report at intake."[38]

---

[32] *Id.*

[33] *Id.*

[34] *Id.* at 461.

[35] *Id.* at 435.

[36] *Id.*

[37] *Id.*

[38] *Id.*

On October 5, 2010, Plaintiff saw Margo Stevens at Valley Mental Health and requested medication for manic depression.[39] Plaintiff reported feeling edgy and noted stress and frustration over being homeless.[40] Ms. Stevens noted that Plaintiff misunderstood her Depakote instructions and was improperly taking a smaller dose than prescribed.[41] Ms. Stevens noted that Plaintiff was dressed casually, was well groomed, and had painted toenails and well-manicured fingernails.[42] Plaintiff reported having low tolerance for dealing with stress and frustration but calmed down as the interview progressed.[43] Ms. Stevens noted that Plaintiff's alcohol abuse was in early full remission.[44] Ms. Stevens also noted that at this session Plaintiff "describe[d] herself as an alcoholic having consumed excessive amounts of beer over the years."[45]

However, by December 13, 2010, Plaintiff reported that she was drinking beer again. Mr. Rasmussen noted that "[a]s is typical for [Plaintiff] when she has money, she has been drinking beer."[46] She also reported going off her medication about three weeks prior and being more irritable.[47] Because Plaintiff had received Medicaid, Mr. Rasmussen transferred Plaintiff to a different program—North Valley Adult Outpatient ("North Valley").[48] In January 2011,

---

[39] *Id.* at 454.

[40] *Id.*

[41] *Id.*

[42] *Id.* at 455.

[43] *Id.* at 455–56.

[44] *Id.* at 456.

[45] *Id.* at 455.

[46] *Id.* at 715.

[47] *Id.*

[48] *Id.*

Plaintiff saw Ms. Stevens again, requested medication refills, and was prescribed Depakote, Trazodone, and Zyprexa.[49]

On February 8, 2011, Plaintiff saw Heather Bath, SSW, at North Valley. Plaintiff told Ms. Bath that she was an alcoholic and wanted "to stop drinking."[50] During that same session, Plaintiff indicated that she used alcohol to wake up and that people criticized her drinking.[51] Ms. Bath noted that Plaintiff "recognized many of her problems were due to drinking and she was ready to quit" and that "there were periods of time she did not remember due to being drunk," but that "she was ready to go to detox and get sober."[52]

That same day, Plaintiff saw Dr. Meredith Alden, noting that she had not taken medications for two months and wanted to resume medications.[53] She was prescribed Depakote, Zyprexa, and Trazodone.[54]

On June 1, 2011, Plaintiff met with Candice Adair, SSW, and discussed her previous goal to stop drinking.[55] Plaintiff indicated that she was ambivalent about her previous goal to quit drinking. Plaintiff indicated she was not sure she wanted to quit and said "I can stop drinking and feel awful, or I can keep drinking and feel ok."[56] One week later, Plaintiff told Ms. Adair that she wanted to see a doctor about taking Antabuse in order to keep her from drinking.

---

[49] *Id.* at 717.

[50] *Id.* at 778.

[51] *Id.*

[52] *Id.*

[53] *Id.* at 779.

[54] *Id.*

[55] *Id.* at 782.

[56] *Id.*

Plaintiff admitted to drinking beer the day before the appointment and noted that she was worried about how Father's Day would impact her because of the death of her father.[57]

On July 20, 2011, Plaintiff saw Dr. Alden and admitted that she had stopped taking her medications shortly after her last visit in February 2011.[58]

### 2. State Agency Physicians

In October 2010, Dr. Zone, a state agency psychologist, reviewed the evidence in this case and noted Plaintiff suffers from bipolar disorder, alcohol abuse, and personality disorder not otherwise specified.[59] Despite these impairments, Dr. Zone stated that Plaintiff could perform low stress, low social contact work.[60] Also in October 2010, Dr. Susanne Throbe, a state agency physician, reviewed the evidence and stated Plaintiff was "capable of simple, low stress work with her physical allegations being nonsevere."[61]

In March 2011, as part of the reconsideration process, Robert Finley, a state agency psychologist, reviewed the evidence and stated that Plaintiff could perform unskilled work with limited exposure to others.[62] The following day, Rox Burkett, a state agency physician, reviewed the evidence and found Plaintiff's physical medical complaints to be nonsevere.[63]

---

[57] *Id.* at 783.

[58] *Id.* at 787.

[59] *Id.* at 531.

[60] *Id.* at 531–33.

[61] *Id.* at 529–30.

[62] *Id.* at 776.

[63] *Id.* at 777.

C.    HEARING TESTIMONY

At the hearing, the ALJ received testimony from Plaintiff and a vocational expert. Plaintiff, in discussing her trouble with suicide, indicated that her first suicide attempt occurred in 1988.[64] However, she describes suicidal ideation as far back as she can remember and described her mother as physically and emotionally abusive and her father as an alcoholic.[65] She indicated she started drinking when she was about twenty-six years old and indicated that her drinking escalated when she was about thirty-two.[66] Plaintiff admitted that she drinks alcohol "[w]henever it's offered" and elaborated that usually she drinks every other day or every three days.[67] Plaintiff later noted that she drinks at least once a week and that when she drinks she drinks about eight beers.[68] She indicated, "I don't think alcohol is an issue, I think it's my depression."[69]

Plaintiff testified that she was prescribed medication to help with the suicidal ideation, but she stopped taking her prescription medications when she transferred from the Fourth Street Clinic to Medicaid because she could not afford the Medicaid co-pay for her medications.[70]

During the hearing, Plaintiff also discussed her work history as a cashier and described trouble staying focused and having a temper.[71] She also described a temporary position at

---

[64] *Id.* at 61.

[65] *Id.*

[66] *Id.* at 63.

[67] *Id.* at 64.

[68] *Id.* at 89.

[69] *Id.* at 63.

[70] *Id.* at 59.

[71] *Id.* at 69–70.

Rocky Mountain Racetrack, a position that she stopped attending when she put her hand in a snow-cone machine despite being told not to do so and cut her finger and nail.[72]

## D. VOCATIONAL EXPERT

Kent Granat, a vocational expert, testified that Plaintiff had past work experience as a hospital housekeeper, a hand packager, a cashier, and a Mexican food maker.[73]  The ALJ asked Mr. Granat to assume a hypothetical individual with the same vocational characteristics as the Plaintiff—same age, education, work experiences, and limitations.[74]  Mr. Granat testified that such a hypothetical individual could perform her past work as a hospital housekeeper, hand packager, and Mexican food maker but could not perform the cashier and child monitor positions.[75]  Limiting the hypothetical individual to light work only would preclude the hospital housekeeper and hand packager position, but would still allow the individual to work as a Mexican food maker.[76]

## E. THE ALJ's DECISION

The ALJ followed the six-step[77] sequential evaluation process in deciding Plaintiff's claim.  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 1, 2010, the alleged disability onset date.[78]

---

[72] *Id.* at 69.

[73] *Id.* at 94.

[74] *Id.* at 94–96.

[75] *Id.* at 96.

[76] *Id.* at 97.

[77] Typically the ALJ proceeds through a five-step inquiry.  However, in evaluating whether drug and alcohol addiction is material, the ALJ conducts a sixth step to determine whether the claimant's other impairments would "improve to the point of nondisability in the absence of DAA." SSR 13-2p, 78 Fed. Reg. 11,939, 11,941 (Feb. 20, 2013).

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: continuous alcohol abuse, bipolar disorder, and personality disorder.[79]

At step three, the ALJ found that Plaintiff's impairments, when considering all impairments including the drug and alcohol addiction ("DAA"), met or equaled a listed impairment.[80]

At step four, the ALJ found that in the absence of alcohol abuse, Plaintiff would have the residual functional capacity to perform a full range of work at all exertional levels with certain limitations, including limiting her to simple, routine work with little decisionmaking, limiting her job-related contact with others, and limiting the amount of changes in her routine.[81]

At step five, the ALJ found that, if Plaintiff stopped the DAA, there would be jobs in the national economy that Plaintiff could perform, including her past relevant work as a hospital housekeeper, hand packager, and Mexican food maker.[82]  He further found that if she stopped the substance abuse, she would be able to perform the work requirements and the requirements would not be precluded by her residual functional capacity.[83]

At step six, the ALJ found that if Plaintiff stopped abusing alcohol, her impairments would no longer meet the criteria for the listings, meaning the ALJ found that without the alcohol abuse, Plaintiff would not be disabled.[84]

---

[78] R. at 25.

[79] *Id.*

[80] *Id.*

[81] *Id.* at 28.

[82] *Id.* at 33.

[83] *Id.*

[84] *Id.* at 27.

## III. DISCUSSION

Plaintiff contends that the ALJ opinion is not supported by substantial evidence and that the ALJ erred by failing to apply the correct legal standard to the DAA determination and the DAA materiality determination. Plaintiff raises the following issues in her brief: (1) whether the ALJ erred in his DAA determination, (2) whether the record contains a DAA diagnosis by an acceptable medical source, (3) whether the ALJ erred in his DAA materiality analysis, (4) whether a medical source must address whether or not Plaintiff's other impairments would improve in the absence of DAA, (5) whether the ALJ's DAA determination is supported by substantial evidence, and (6) whether the ALJ properly addressed step four even though he did not make findings concerning the mental demands of Plaintiff's past work.

### A. DAA DETERMINATION

Pursuant to the Social Security Act, disability due to DAA is not a proper basis for an award of benefits if DAA is a contributing factor material to the determination of disability.[85]

Plaintiff first argues that the ALJ erred by failing to apply Social Security Ruling 13-2p[86] ("SSR 13-2p" or "the Ruling") in determining that Plaintiff has DAA. SSR 13-2p is a recent ruling that explains the SSA's policies for considering drug and alcohol addiction. While it is true the ALJ did not specifically rely on SSR 13-2p, the ALJ is excused from doing so because the Ruling was issued on February 20, 2013—almost a year and a half after the ALJ issued his opinion in this matter.

---

[85] 42 U.S.C. § 423(d)(2)(C).

[86] SSR 13-2p, 78 Fed. Reg. 11,939, was released by the Social Security Administration on February 20, 2013—after the ALJ conducted his hearing and issued a decision in this case. However, both parties cite to this document in their briefing, and to the extent it is helpful, the Court relies on it throughout.

The Ruling, which both parties cite to in their briefing, provides a six step evaluation process for determining DAA materiality. That process is as follows: First, does the claimant have DAA? Second, is the claimant disabled considering all impairments including DAA? Third, is DAA the only impairment? Fourth, is the other impairment disabling by itself while the claimant is dependent upon or abusing drugs or alcohol? Fifth, does the DAA cause or affect the claimant's medically determinable impairments? Sixth, could the other impairments improve to the point of nondisability in the absence of DAA?

The ALJ conducted this analysis and concluded that Plaintiff's impairments would improve to the point of nondisability in the absence of DAA. Even without the guidance of SSR 13-2p, the ALJ's decision on DAA comported with controlling law. In deciding a disability claim involving DAA, the ALJ should conduct the sequential evaluation without separating out the impact of DAA.[87] If the ALJ finds a claimant to be disabled, and there is medical evidence of DAA, then the ALJ should determine whether the claimant would still be disabled if she stopped using drugs or alcohol.[88]

The ALJ in this case followed the six-step rubric. He found that Plaintiff's impairments, including her substance use disorder, met listing §§ 12.04, 12.08, and 12.09.[89] He then found that if Plaintiff stopped her substance abuse she would continue to have "a severe impairment or combination of impairments."[90] He then found that if she stopped the substance abuse, Plaintiff

---

[87] SSR 13-2p, 78 Fed. Reg. 11,939; *Drapeau v. Massanari*, 255 F.3d 1211, 1214–15 (10th Cir. 2001).

[88] *Drapeau*, 255 F.3d at 1214.

[89] R. at 25.

[90] *Id.* at 26.

would not have an impairment or combination of impairments that meets or medically equals

listing §§ 12.04 or 12.08, or any other listing.[91]  The ALJ did not err in his application of the law

to his DAA determination.

B.     ACCEPTABLE MEDICAL SOURCE

Plaintiff next argues that the ALJ erred in applying a DAA analysis because the record

did not contain a diagnosis of substance use disorder by an acceptable medical source.  DAA is

defined as a Substance Use Disorder by the Diagnostic and Statistical Manual of Mental

Disorders (DSM) and "[i]n general, the DSM defines Substance Use Disorders as maladaptive

patterns of substance use that lead to clinically significant impairment or distress."[92]   SSR 13-2p

also notes that there must be "objective medical evidence—that is, signs, symptoms, and

laboratory findings—from an acceptable medical source that supports a finding that the claimant

has DAA."[93]  Acceptable medical sources under the current regulations include licensed

physicians and licensed and certified psychologists.[94]

The ALJ found that there was substantial medical evidence of DAA by acceptable

medical sources in Plaintiff's record.  On May 6, 2010, Dr. Freeman diagnosed Plaintiff with

"polysubstance abuse."[95]  Dr. Freeman was the attending physician who saw Plaintiff in the

emergency department on May 6, 2010, after an intentional overdose.[96]  The following day, Dr.

Lewis, another treating physician, diagnosed bipolar disorder not otherwise specified,

---

[91] *Id.* at 27.

[92] SSR 13-2p, 78 Fed. Reg. at 11940.

[93] *Id.*

[94] *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).

[95] R. at 344.

[96] *Id.* at 342.

posttraumatic stress disorder, alcohol abuse, cocaine abuse, and personality disorder cluster B traits.[97] In October 2010, Dr. Zone, a state agency psychologist reviewed the evidence and diagnosed Plaintiff with bipolar disorder, alcohol abuse, and personality disorder not otherwise specified.[98] These are the type of acceptable medical sources and the type of objective medical evidence the Ruling contemplates.

SSR 13-2p also notes that "even when we have objective medical evidence, we must also have evidence that establishes a maladaptive pattern of substance use and the other requirements for diagnosis of a Substance Use Disorder(s) in the DSM."[99] There is sufficient evidence in the record from which the ALJ could find a maladaptive pattern of substance use. Therefore, the Court finds that there is substantial evidence to support the ALJ's finding of DAA.

C.     DAA MATERIALITY ANALYSIS

Plaintiff next argues that the ALJ erred in finding that Plaintiff's DAA was material to the determination of disability because her other impairments would not improve in the absence of DAA and that Plaintiff's symptoms actually worsen in the absence of alcohol use. Plaintiff argues that the ALJ erred by not considering periods of abstinence and that the ALJ was "required to do more than simply conclude that in the absence of alcohol use Paniagua would not be disabled" absent DAA.[100]

---

[97] *Id.* at 340.

[98] *Id.* at 531.

[99] SSR 13-2p, 78 Fed. Reg. at 11,944.

[100] Docket No. 18, at 11.

To the extent that Plaintiff argues the ALJ improperly applied the law regarding DAA materiality, Plaintiff's argument fails for the reasons stated above. To the extent that Plaintiff argues there is not substantial evidence to make such a materiality finding, the Court agrees.

If a claimant is determined to be disabled, "we must then determine whether the claimant would continue to be disabled if he or she stopped using drugs or alcohol; that is, we will determine whether DAA is 'material' to the finding that claimant is disabled."[101]

The ALJ must review the record as a whole and cannot engage in "selective and misleading evidentiary review."[102] "[I]f the effects of a claimant's mental impairments cannot be separated from the effects of substance abuse, the DAA is not a contributing factor material to the disability determination."[103]

Here, the ALJ followed this procedure by first finding Plaintiff disabled under the initial 5-step inquiry, but then found that claimant would not be disabled in the absence of DAA. The ALJ found that absent DAA, Plaintiff would have only mild restrictions on her activities of daily living, moderate difficulties in social functioning, and moderate restrictions on concentration, persistence and pace.[104] The ALJ's determination that Plaintiff would not be disabled absent her disability is not supported by substantial evidence. In making this finding, the ALJ engaged in selective and misleading evidentiary review of the record.

---

[101] SSR 13-2p, 78 Fed. Reg. at 11,940.

[102] *Sherman v. Apfel*, 141 F.3d 1185, 1998 WL 163355, at *6 (10th Cir. April 8, 1998) (unpublished table decision) (citing *Teter v. Heckler*, 775 F.2d 1104, 1106 (10th Cir. 1985)).

[103] *Salazar v. Barnhart*, 468 F.3d 615, 623 (10th Cir. 2006).

[104] R. at 27, 31.

As for activities of daily living without DAA, the ALJ mischaracterized the level of Plaintiff's daily activities. In August 2010, Plaintiff filled out forms containing questions about her daily activities and the effect of her impairments on those activities.[105] From this, the ALJ found that Plaintiff "cooks, cleans, watches movies, reads, shops, pays bills, attends appointments, walks, rides a bike, and uses public transportation to get around."[106]

However, in so describing Plaintiff's activities, the ALJ ignored other statements on the same form that evidence limitations on Plaintiff's activities. For instance, in concluding that Plaintiff cooks, the ALJ neglected to note that she prepares "sandwiches, [and] can[ned] food [in a] microwave."[107] While Plaintiff noted that when she goes out she travels by public transportation, walking, and riding a bicycle, she also noted that she does not go out often.[108] On the same form Plaintiff was asked how often she goes out and Plaintiff filled in, "just to throw trash. I don't like to face people."[109] The same form asked Plaintiff to list the places she goes on a regular basis; Plaintiff wrote, "No where, only appts."[110] A closer examination of the record also indicates that while Plaintiff indicates that she likes reading, she testified that after having a book for about four months, she is on about page 100.[111] In an hour period of time, Plaintiff can

---

[105] R. at 265–72.

[106] *Id.* at 31.

[107] *Id.* at 267.

[108] *Id.* at 268.

[109] *Id.*

[110] *Id.* at 270.

[111] *Id.* at 77.

stay focused on reading for about five minutes.[112]  Further, Plaintiff has difficulty with reading comprehension.[113]

The ALJ similarly concluded that Plaintiff's mental impairment both with and without DAA results in moderate difficulty in maintaining social functioning.  In support of this finding, the ALJ indicated that Plaintiff testified that she is capable of having a poor attitude and bad temper, which makes it difficult to get along with others.  "Yet claimant does have a good relationship with her children and grandchildren and gets along okay with authority figures."[114]  The ALJ did not appear to consider that Plaintiff also provided testimony about working at Rocky Mountain Raceway, where she purposely stuck her finger in a snow-cone machine because she was told not to put her finger in the machine.[115]  Nor did the ALJ appear to consider that Plaintiff "reported hearing voices at times when she became severely depressed."[116]  Plaintiff indicated that she was not drinking or using controlled substances during those times she heard such voices.[117]

Finally, the ALJ concluded that Plaintiff's mental impairment without DAA would result in moderate deficiencies of concentration, persistence, or pace.  In so finding, the ALJ noted that Plaintiff enjoys reading but has difficulty staying focused and reading for long periods of time.  But as indicated above, Plaintiff testified that she can stay focused on reading for only about five

---

[112] *Id.*

[113] *Id.* at 78.

[114] *Id.* at 31.

[115] *Id.* at 69.

[116] *Id.* at 354.

[117] *Id.*

minutes out of an hour and has difficulty with comprehension and retention.[118] The ALJ also indicated that Plaintiff reported some difficulty in following written instructions and handling changes in routine. In so concluding, the ALJ did not consider Plaintiff's daily activity forms where she indicated she doesn't follow written instructions well. Additionally, the ALJ did not appear to consider that the Plaintiff had, in fact, misunderstood the instructions for taking her prescription medication Depakote.[119]

"By mentioning only parts of plaintiff's statements, while leaving out other important parts, the ALJ engaged in the kind of selective and misleading evidentiary review that this and other courts have rejected."[120] The ALJ used a mischaracterization of the level of Plaintiff's daily activities, social functioning, and concentration, persistence, and pace during a period of sobriety in order to determine that her mental impairment without DAA would result in only mild and moderate restrictions of her activities of daily living and in finding that claimant's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's listed] residual functional capacity assessment."[121]

In addition, the Court agrees with Plaintiff's argument that the ALJ failed to fully consider Plaintiff's periods of abstinence. Plaintiff alleges sobriety between May 6, 2010, and July 23, 2010. However, the evidence about Plaintiff's sobriety during this period is inconsistent. Plaintiff also alleges sobriety between July 26, 2010, and early December 2010.

---

[118] *Id.* at 77–78.

[119] *Id.* at 454.

[120] *Sherman*, 1998 WL 163355, at *6 (citing *Teter*, 775 F.2d at 1106.)

[121] R. at 39.

There are no such record inconsistencies during this period. Even during the latter period, Plaintiff reported having auditory hallucinations, suicidal ideation, agitation, and frustration.[122] In May 2010, Plaintiff reported that she had a history of "hearing voices at times when she became severely depressed."[123] Plaintiff indicated that she heard these voices during periods of time when she was not using alcohol or controlled substances.[124] She experienced fights with friends, lost her temper, and broke a radio.[125] She experienced the death of a son-in-law and "couldn't even cry."[126] The ALJ was required to evaluate these alleged periods of abstinence.[127]

"To find that DAA is material, [the ALJ] must have evidence in the case record demonstrating that any remaining limitations were not disabling during the period [of abstinence]."[128] The analysis of a sobriety period is important to the DAA analysis and the ALJ mischaracterized the level of Plaintiff's functioning during this critical period. Remand is therefore necessary for the ALJ to determine whether Plaintiff's remaining limitations during this period of abstinence were disabling or to determine that Plaintiff is not credible regarding these periods of abstinence.

---

[122] *Id.* at 454–57.

[123] *Id.* at 353.

[124] *Id.*

[125] *Id.* at 454.

[126] *Id.* at 435.

[127] *Salazar*, 468 F.3d at 623–24 (relying on agency guidance); SSR 13-2p, 78 Fed. Reg. at 11,945.

[128] *Id.*

D.      OTHER ARGUMENTS

Plaintiff makes a number of other arguments concerning the ALJ's decision.  The Court is not persuaded that such arguments have merit.  The Court, therefore, remands this case to address only whether Plaintiff's DAA is material, that is, whether claimant's other impairments would improve to the point of nondisability in the absence of DAA.

## IV.  CONCLUSION

It is therefore ORDERED that the ALJ's decision is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for the purpose of conducting additional proceedings as set forth herein.  The Clerk of this Court is directed to enter judgment remanding this case and shall close this case forthwith.


DATED this 2nd day of April, 2014.

BY THE COURT:

_____

Ted Stewart
United States District Judge